[49 NYS3d 414]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TRAVIS TELESFORD, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BERNIE CELESTINE, Appellant.

First Department, March 15, 2017

**APPEARANCES OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Katharine Skolnick* and *Sharmeen Mazumder* of counsel), for Travis Telesford, appellant.

*Seymour W. James, Jr., The Legal Aid Society*, New York City (*Andrea L. Bible* of counsel), for Bernie Celestine, appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Patricia Curran* of counsel), for respondent.

**OPINION OF THE COURT**

Renwick J.

In this case, we must determine what supplemental instructions are required when a jury repeatedly expresses confusion, during deliberations, about the concept of intent in a robbery prosecution of two defendants charged under an accessorial liability theory. Under the circumstances here, we find that defendants were deprived of a fair trial when the court erred by merely rereading robbery and accessorial liability charges to the jury.

## Factual and Procedural Background

### Evidence Adduced at Trial

The robbery charges stem from defendants' alleged forcible taking or retaining of three rings from a small store in Chinatown that sold scarves, jewelry, bags and souvenir hats. At about noon on August 7, 2013, Yu Ying Li, who spoke only limited English, was watching her husband's store while he went to the basement to retrieve some items. Li's friend, Ms. Zheng, was at the store as well. Li was 60 years old, stood about five feet one inch, and weighed about 87 pounds. Zheng was 53 years old, about the same height, but heavier. About a minute after Li's husband had gone to the basement, defendants Telesford and Celestine entered the otherwise empty store. Li greeted them and asked if she could help them. The men told her that they were "just looking." The men approached the jewelry case, and although Li did not see them trying on men's rings, Zheng did. A short time later, as defendants were about to leave, Li noticed that three men's rings were missing from the display tray. Li told Zheng about the three missing rings, and Li asked her to try to get them back from the two men.

Li approached Celestine, and asked, "Why my ring?" or "Why my ring no more?" while pointing to the empty slots in the display case. Celestine said, "No, I don't know." Telesford "inserted" himself between Li and Celestine, and they both denied that Celestine had taken any rings. Li tried to tell Telesford to ask Celestine to return the rings. Telesford then hit or patted Li on her left shoulder with his right hand. When Li hit Telesford back, Telesford responded, "How dare you hit me," and hit Li a second time.

Li repeatedly told Telesford, "You no good man," and (because she did not know how to say "rude,") that he was a "bad man" and that he had hurt her. He responded, "You said I am no good man?" and hit her with both hands. Li then used both her hands to push Telesford away. At that point, Celestine said, "Stop," opened his hand, and offered to return the rings. He either handed two rings to Li or threw them in the case. Li said, "One more," because three rings had been missing, but Celestine said, "No. No," then hesitated for a moment and moved his hand slightly in his pocket. Telesford said "Go. Go. Go," and gestured to Celestine in a manner that Li thought meant that the men should go and that Celestine should not return the third ring.

When Celestine moved to leave, Li said she was calling the police. Telesford replied that if Li called the police, he would

also call the police because Li "can't speak English," and said something about "illegal," "immigration," and "family together," though Li did not understand what he said. Both men then tried to leave the store. Telesford raised his arm as if he were going to hit Li. Celestine said something to Telesford, who then looked at his cell phone and said something like, "No problem." Telesford looked "so fierce" at that point that Li grew afraid that he was going to hit her again. At one point, one of the men also spat at Li.

Li told Telesford that she would "like to dare" him to hit her, but she covered her head with her arm and "pray[ed]" to God for "help." She then realized that her right arm was being "tightly held" just as Telesford punched her in the right side of her mouth, causing her mouth to bleed. Zheng saw contact between Telesford's hand and Li's mouth and saw blood on the right side of Li's mouth.

Meanwhile, Officers Lamour and Watson were in the vicinity, and heard a woman yell, "Officer, look" or "help police." Lamour looked up and saw Celestine holding a woman while Telesford punched her. Watson also saw Telesford strike an Asian woman in the lip. The officers apprehended defendants. Lamour then frisked both defendants and recovered a ring from Celestine's left front pants pocket. Li identified the ring, which was valued at $25.

Li, who also suffered a bruise to her arm where Celestine had grabbed her, felt dizzy and faint. The police took her to a hospital, where a doctor examined her, treated her for a mild abrasion to her lip with "no active bleeding" and "no loose teeth," and advised her to treat the wound with bacitracin. Later that day, Li felt ill and vomited. Li was not able to go to work the next day and did not return to the store until the following Monday. Two days after the robbery, Li saw a doctor because her mouth was "still not good" and she was dizzy and had headaches. Li's mouth hurt for "[s]everal days," "almost like over a week," and her head hurt for "about one week."

At trial, both defendants testified. Celestine and Telesford, who were college roommates, denied that they entered Yu Ying Li's store with any intent to steal jewelry or anything else. Instead, they claimed that they entered the store because Celestine wanted to purchase a key chain. As Celestine looked at key chains, Telesford stood nearby using the Internet on his cell phone. About five seconds after they entered the store, Li approached Celestine and asked him why he had stolen

something. Celestine told Li he had not taken anything. Li then asked Telesford if he had stolen anything, and he denied having done so. Then, another woman in the store hit Celestine in the shoulder. In response, Celestine asked the woman, "What are you doing, Miss?" and denied that he had taken anything. Li then tried to go into Telesford's pockets, and he brushed off her hand. Li then spat in Telesford's face, and as a "reflex" or a "reaction," his hand "just went up" and he "backhand[ed]" Li to stop her from spitting on him or doing "anything else."

Jury Charge, Notes and Deliberations

Initially, the court instructed the jurors that it was their "obligation" to "evaluate" the evidence as it applied to "each defendant separately"; that the jurors must consider "each instruction on the law" as "referring to each defendant separately"; that they must return a separate verdict for each defendant; and that those verdicts "may be, but need not be, the same." It reminded the jury that the People had the burden of proving beyond a reasonable doubt that "each defendant" acted with the same state of mind required for the commission of the crime, and, "either personally, or by acting in concert with the other person," committed each of the remaining elements of the crime.

After giving the standard CJI instruction on accessorial liability and robbery (forcible stealing), the court instructed the jury on second-degree robbery under count one, explaining that a defendant is guilty under this count "when that person forcibly steals property and when that person is aided by another person actually present." Specifically, the court charged that with respect to each defendant separately, the People had to prove beyond a reasonable doubt both: (1) that the defendant personally, or by acting in concert with another person, forcibly stole property from Li; and (2) that the person was aided in doing so by another person actually present.

The court next instructed the jury on second-degree robbery under count two, explaining that a defendant is guilty under this count "when that person forcibly steals property and when in the course of the commission of the crime, that person or another participant in the crime, causes physical injury [impairment of physical condition or substantial pain] to any person who is not a participant in the crime." Thus, the court charged again that with respect to each defendant separately, the People had to prove beyond a reasonable doubt both: (1) that

defendant personally or by acting in concert with another person forcibly stole property from Li; and (2) that in the course of the commission of the crime, defendant, or another participant in the crime, caused physical injury to Li.

After the charge concluded, Celestine's counsel objected to the section of the charge regarding the theory of robbery aided by another, arguing "that by charging them acting in concert I don't think that's a correct statement of the law." Rather, she submitted that a correct statement of the law would be, as to each individual, that Celestine stole property, and in the course of doing so, was aided by Telesford, arguing that it requires forcible stealing by one defendant and aid in that stealing by the other, and that either defendant could have used the force in stealing where they both shared the intent to commit the underlying theft. Counsel also noted that it does not matter which one of them inflicts the injury. The court asked if counsel was asking it to reread the elements without the accomplice liability part, and counsel stated that particularly as to the robbery (aided by another) charge, saying acting in concert makes it "messy," and it has "to be parsed out to the jury for them to understand that they must first find a forcible taking and then find the aiding by another." The court indicated that it would not change its charge. Celestine's lawyer took an exception and Telesford's lawyer stated that she joined in everything Celestine's counsel had said.

Shortly after deliberations began, the jury sent out a note requesting the court's clarification of intent, as well as a written definition of the charges for both defendants. Celestine's lawyer asserted that the note indicated that the jurors were "confused," and argued that "things need to be separated out, especially with respect to the robbery." Telesford's lawyer agreed. The court declined to charge the jury in a different manner, and merely advised the jury that it could not provide a written charge, but could read back any portion.

Shortly thereafter, the jury asked to "hear the full definition of all the charges for both defendants," and Celestine's counsel said that she "repeat[ed her] objection." The court then reread its charge regarding the separate consideration of each defendant; its accessorial liability charge; its definitions of larceny and forcible stealing; the elements of both counts of second-degree robbery; and its charge on the elements of petit larceny as to Celestine.

Later, the court followed Telesford's counsel's suggestion that it respond to a jury note by advising that there was no defini-

tion of "shared mind intent" and by rereading the definition of "working in concert." Without an objection, the court also repeated its original charge on accessorial liability and offered to provide an expanded intent charge. When the jurors sent out a note stating that they were deadlocked, the court asked them to continue deliberating the following day. The next day, the jurors requested to hear an "expanded definition of intent," and the court complied, without any objection from defendants. A few minutes later, the jurors asked to hear the "definition of intent again" and to "hear the charges again." Without any objection from either defendant, the court again repeated its original charges. After the jurors resumed their deliberations, Celestine's counsel noted that she "ha[d]n't waived [her] objection to the charge," while Telesford's attorney said nothing.

The jurors then returned their verdict. Defendants were convicted of second-degree robbery for causing physical injury to Li in the course of stealing a ring from her store. The jury did not reach a decision as to the charge of robbery in the second degree under an aided theory and did not consider the petit larceny charge because it convicted defendants of a robbery charge. The court declared a mistrial as to those counts. After sentencing, the prosecutor moved to dismiss the robbery count under the aided theory.

## Discussion

Both Telesford and Celestine initially argue that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. There is no basis for disturbing the jury's credibility determinations. The evidence supports reasonable inferences that Telesford knew that Celestine had shoplifted merchandise and had only returned part of it to the victim, that at least one of the reasons that Telesford assaulted the victim was to help Celestine retain the remaining stolen property, that Celestine shared Telesford's intent and joined in Telesford's use of force by restraining the victim, and that this violent attack on the victim was not a mere response to insults by her. There was also ample evidence that the victim sustained physical injury (see generally People v Chiddick, 8 NY3d 445, 447 [2007]; People v Guidice, 83 NY2d 630, 636 [1994]).

While the jury's verdict was legally sufficient and not against the weight of the evidence, the conclusion is inescapable that defendants were denied a fair trial due to the trial court's fail-

ure to meaningfully respond to jury inquiries during deliberations. CPL 310.30 provides that the jury may request further instructions at any time during its deliberations and if it does so the court must "give such requested information or instruction as [it] deems proper." While the court possesses some discretion in framing its supplemental instructions, it must respond meaningfully to the jury's inquiries (*People v Malloy*, 55 NY2d 296, 301 [1982], *cert denied* 459 US 847 [1982]; *People v Gonzalez*, 293 NY 259, 262 [1944]). The sufficiency of a trial court's response is gauged by "the form of the jury's question, which may have to be clarified before it can be answered, the particular issue of which inquiry is made, the supplemental instruction actually given and the presence or absence of prejudice to the defendant" (*People v Malloy*, 55 NY2d at 302).

A trial court confronted with a request for supplemental instructions must perform the delicate operation of fashioning a response that meaningfully answers the jury's inquiry while at the same time working no prejudice to the defendant (*id.*). There is no per se rule concerning the adequacy of a court's response or prohibiting in every case the rereading of the original charge (where it contains a correct answer to the same question). Indeed, where the jury expresses no confusion and the original charge is clear, a different charge may well be simply an exercise in semantics and could itself create the confusion sought to be avoided (*see People v Santi*, 3 NY3d 234, 248 [2004]). However, where the court fails to give information requested, upon a vital point, a failure to respond may constitute error. The error is not so much that an instruction is inadequate in some legal respect, but that the jury, misled by or not comprehending the original charge, remains perplexed about the elements of the crime or the application of the law to the facts.

The jury in this case, as the excerpt from the record cited above illustrates, was confused about the element of intent, an essential element of any robbery offense. The crime of robbery, as defined by the Penal Law, has two straightforward but critical mens rea (intent) elements. Robbery is defined in Penal Law § 160.00 as follows:

> "Robbery is forcible stealing. A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of:

"1. Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or

"2. Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

Simply stated: The gist of robbery is larceny by force from the person (id.), and the gist of larceny is the taking and carrying away of personal property of another with the specific intent to steal such property (see Penal Law § 155.05 [1]). The second element of intent of a robbery offense comes from the "for the purpose" language, which sets forth the mens rea requirement that the use of force be intended to either compel a person to deliver or prevent resistance to the taking of the subject property (see People v Smith, 79 NY2d 309, 312 [1992]).

Here, the jury's confusion on intent stems from the insertion of the accessorial liability theory into an otherwise straightforward robbery case. As indicated, the trial court initially instructed the jurors that it was their obligation to evaluate the evidence as it applied to each defendant separately and that they must consider each instruction on the law as referring to each defendant. However, in addition to charging both robbery counts one and two, as to each defendant, the trial court also concomitantly charged the jury on accessorial liability as to each defendant. Thus, accessorial liability was a central component of the case. Yet, faced with the jurors' confusion on intent, the trial court here made no attempt to explain the import of the intent element of the robbery offenses under accessorial liability in determining each defendant's criminal liability. At the outset, to help the jurors understand accessorial liability, the trial court should have made clear that whether a defendant is accused as the perpetrator or as the accomplice is irrelevant. Indeed, in the context of accessorial liability, it is factually and legally impossible to be an accomplice without being a principal in the commission of the crime (see People v Duncan, 46 NY2d 74, 79-80 [1978], cert denied 442 US 910 [1979] ["There is no distinction between liability as a principal and criminal culpability as an accessory"]; cf. People v Rivera, 309 AD2d 881 [2d Dept 2003], lv denied 1 NY3d 600 [2004]).

Furthermore, to help the jurors understand the import of the intent element under an accessorial liability charge, the trial

court should have made clear to the jurors that when two or more defendants are tried jointly for the commission of a robbery offense under an acting in concert theory, a defendant's conviction or acquittal depends on shared intent. Indeed, under an accomplice liability theory, shared intent is the lynchpin of liability (*see People v Rivera*, 309 AD2d at 881-882 ["The People failed to establish that the defendant was acting in concert with his codefendant (where) (t)he evidence, when considered in the light most favorable to the prosecution, failed to establish that the defendant shared the codefendant's intent to burglarize the complainant's home" (citations omitted)]; *People v Taylor*, 141 AD2d 581, 581-582 [2d Dept 1988], *lv denied* 72 NY2d 962 [1988] ["While the prosecution established that the defendant may have unwittingly aided the principal actors to the extent that he drove them away from the scene of the crime, proof that the defendant harbored any intent to commit robbery or that he intentionally aided in the perpetration thereof was lacking in this case"]).

Finally, to help the jurors understand the import of the intent element under an accessorial liability charge, the court should have explained to the jurors that "[w]here, as here, the codefendants are charged with acting in concert to rob, intent must be independently established as to each defendant; it cannot be imputed to all based upon proof offered against one codefendant" (*People v De Jesus*, 123 AD2d 563, 564 [1st Dept 1986], *lv denied* 69 NY2d 745 [1987]; *see also People v La Belle*, 18 NY2d 405 [1966]). That is, under an accessorial liability theory, it is not sufficient that each defendant's conduct may have aided the other in doing what constituted the robbery, where neither defendant had the intent required to be found guilty of the robbery offense (*see e.g. Matter of Bianca W.*, 267 AD2d 463 [2d Dept 1999] [evidence that the juvenile struck and killed victim during a scuffle was insufficient to establish that she shared her sister's intent to steal from victim]; *People v Alfaro*, 260 AD2d 495 [2d Dept 1999] [when the defendant joined the codefendant in fight arising out of dispute over unsatisfied civil judgment and victim's gold chains were pulled off during the fight and later found on the ground, it was reasonable to conclude that the codefendant had broken chains without the defendant realizing he had done so]; *People v Morales*, 130 AD2d 366 [1st Dept 1987] [although defendant participated in assault arising from perceived insult to victim's wife, no evidence he participated in surreptitious theft during it]).

With regard to Telesford, the issue of intent was critical in one respect. The evidence adduced at trial undeniably established that Telesford assaulted the complainant. To sustain a conviction for robbery in the second degree based upon accessorial liability, however, the evidence, when viewed in a light most favorable to the prosecution, must prove beyond a reasonable doubt that Telesford acted with the mental culpability necessary to commit the robbery and that, in furtherance thereof, he solicited, requested, commanded, importuned or intentionally aided the principal to commit such crime (*see* Penal Law § 20.00; *People v Karchefski*, 102 AD2d 856 [2d Dept 1984]; *People v Reyes*, 82 AD2d 925 [2d Dept 1981]). Thus, in this case, an inference that Telesford helped Celestine commit the robbery, based on his role as an accomplice, would have been insufficient to prove the requisite intent to steal, in the absence of a specific finding that Telesford intended to do more than commit an assault (*see People v Morales*, 130 AD2d at 367-368).

With regard to Celestine, the issue of intent was critical in a different respect. Undeniably, the evidence established beyond a reasonable doubt that Celestine took the three rings. Such conduct, however, by itself, constituted no more than a larceny, absent proof that either defendant used force to take or retain the stolen items. Although, as indicated, Telesford did use force to attack the victim, in order to convict either defendant of robbery, the jury needed to find that the violent attack on the victim, by Telesford, was not a mere response to insults and being spat upon by the victim, but that it was rather part and parcel to the taking or retaining of the stolen items. In other words, the jury had to find that Celestine intended to use force to retain the ring(s), either by using his own force or taking advantage of Telesford's use of force (*see Morales*, 130 AD2d at 367-368; *Matter of Peter J.*, 184 AD2d 511 [2d Dept 1992], *lv denied* 81 NY2d 705 [1993]; *People v Reyes*, 110 AD2d 663 [2d Dept 1985], *lv denied* 65 NY2d 699 [1985]).

The dissent does not—and cannot—dispute that our recommended supplemental instructions would have been helpful to the jury in understanding the import of the element of intent in a robbery prosecution under an accessorial liability theory. Instead, the dissent accuses the majority of engaging in "mere speculation without any evidentiary or factual support" as to the "state of confusion [of] the jury due to its different requests to hear certain definitions and a repetition of the charges." The

dissent's portrayal of the majority as inventing confusion suffers from a narrow view that there was no confusion in giving a literal reading and response to the jury's multiple questions.

Of course, such an inaccurate assessment absurdly suggests that a jury's four successive notes on the same issue is an expression of clarity. More importantly, the dissent's view ignores defendants' theory of defense throughout the trial which was to negate each defendant's intent to forcibly steal the items in question. In this context, the jury's repeated requests for instructions on intent was a clear sign of confusion about the role intent played in an acting in concert prosecution. For the court to essentially repeat the same initial instructions over and over was to effectively close the door on its role of "respond[ing] meaningfully" to the jury's inquiries (*People v Malloy*, 55 NY2d at 302).

In arguing that no confusion ever took place here, the dissent takes the absurd position that "we cannot know the jurors' thought processes or conclude anything from the fact they made multiple inquiries to the court." The fallacy of the dissent's position is based on the false premise that there is nothing "unusual" about the jurors' repeatedly "requesting to hear the charges on different occasions over two days of deliberations." The dissent's myopic view of the record harks back to a comparable mistake by the trial judge who found no apparent confusion based on his literal reading of the jurors' multiple questions on intent.

Unlike the dissent, we cannot ignore the fact that when a jury seeks multiple re-explanations, it is clear that it is having difficulty understanding the concept as originally explained (*see People v De Groat*, 257 AD2d 762, 763 [3d Dept 1999] [where jury requested instructions on "attempt" four times, it would not have been a meaningful response to simply reread original charge for the fourth re-instruction]; *People v Pyne*, 223 AD2d 910, 912 [3d Dept 1996], *lv denied* 88 NY2d 940 [1996] ["(t)he record makes clear that the jury was confused with regard to intent, having previously requested supplemental instructions thereon"]; *People v Brabham*, 77 AD2d 626, 626 [2d Dept 1980] [where jury asked for re-instruction on justification on six occasions, it was error to reread the original charge in the face of such "obvious confusion"]; *cf. People v Santana*, 16 AD3d 346, 347 [1st Dept 2005], *lv denied* 5 NY3d 794 [2005] ["(w)hen the deliberating jury requested the elements of depraved indifference assault for the third time, the

court properly exercised its discretion in delivering a supplemental charge that expanded upon its original explanation of those elements, since the jury was clearly in need of additional guidance"]). Thus, the court's refusal to respond directly to the confusion based upon its literal reading of the juror's questions did not constitute a meaningful response to the requests.

Indeed, this Court has made it abundantly clear that more is required in particular circumstances where the statutory language might be misleading or where the jury has expressed uncertainty about the nature and legal significance of the defendant's conduct (*see e.g. People v Wheeler*, 220 AD2d 288, 288 [1st Dept 1995] [evidence warranted "clarifying charge" that "sale" does not include merely handling drugs as prospective buyer]; *People v McGruder*, 63 AD2d 947, 948 [1st Dept 1978] [supplemental charge that "sale" includes promise to sell inadequate where promise demonstrated at trial too vague to constitute an offer; judge should have amplified circumstances in which promise can be considered offer]).

Finally, we reject the People's argument that the issue of whether the trial court properly responded to the jury's confusion on intent was not preserved. To be sure, the objections to the charge focused on the "aided" count. However, defense counsels' overriding concern was that the charge was confusing to the jury in that it merged everything and issues needed to be "separate[d] out" with respect to the robbery charges. While counsels' objections and requests could have been more clearly articulated, Celestine's lawyer indicated that one problem was that the charge did not make clear that it did not matter which defendant inflicted the injury, but what did matter was whether both defendants shared the intent to commit the theft. Further, with regard to accessorial liability, both attorneys suggested that inserting each defendant's name in the course of giving separate charges as to each would help clarify matters for the jury in such a confusing robbery case under an accessorial liability theory. While the better practice would have been for counsel to more clearly state that the objections encompassed both types of robbery charges on the narrow issue of intent, we are satisfied that the colloquy was adequate to put the court on notice of both defense counsel's concerns about the adequacy of the court's response to the jury inquiries.

In any event, in our view, this is one of those rare cases where "interest of justice" review is warranted. "[W]here the court fails to give information requested upon a vital point no

appellate court may disregard the error" (*People v Cooke*, 292 NY 185, 193 [1944, Lehman, Ch. J., dissenting]). Since the issue of each defendant's intent was the primary disputed issue at trial, as evidenced by the jury's repeated requests for clarification of the charge on intent, we find that the prejudicial effect of the court's inadequate supplemental instruction deprived defendants of a fair trial (*see id.* at 190; *People v Aguilar*, 177 AD2d 197, 200-201 [1st Dept 1992]; *People v Primus*, 178 AD2d 565 [2d Dept 1991]; *see also People v Cataldo*, 260 AD2d 662 [3d Dept 1999], *lv denied* 93 NY2d 968 [1999]).

## Conclusion

Accordingly, the judgment of the Supreme Court, New York County (A. Kirke Bartley, Jr., J.), rendered September 22, 2014, convicting defendant Travis Telesford, after a jury trial, of robbery in the second degree, and sentencing him to a term of four years with five years' postrelease supervision, and the judgment of the same court and Justice, rendered September 16, 2014, convicting defendant Bernie Celestine, after a jury trial, of robbery in the second degree, and sentencing him to a term of 3½ years with two years' postrelease supervision, should be reversed, on the law, the facts, and as a matter of discretion in the interest of justice, the judgments vacated and the matter remanded for a new trial.

TOM, J.P. (dissenting). Because the court's main and supplemental charges conveyed the appropriate principles, as set forth in the Criminal Jury Instructions, concerning each defendant's individualized criminal liability, and constituted a meaningful response to the jury's inquiries (*see generally People v Fields*, 87 NY2d 821, 823 [1995]; *see also People v Santi*, 3 NY3d 234, 248 [2004]), I disagree with the majority's conclusion that defendants were denied a fair trial, and would affirm the convictions.

On August 7, 2013, defendants Telesford and Celestine entered a store on Canal Street. While there, Celestine took three rings from a store display and Telesford struck the woman watching the store, Yu Ying Li. Following the robbery, defendants were tried jointly and were each charged with second-degree robbery under an aided theory and second-degree robbery under a physical injury theory.

The evidence at trial showed that on the day of the robbery Li, a 60-year-old woman weighing approximately 87 pounds, was watching her husband's store where they sold scarves,

jewelry, bags, and souvenir hats. She was accompanied by her friend Ms. Zheng. Shortly after Li's husband had left them, defendants entered the store.

In response to Li's offer of assistance, the men told her that they were "just looking." The men then approached the jewelry case, and Zheng saw them trying on rings. Shortly thereafter, the men headed for the exit just as Li observed that three men's rings were missing from the display tray.

Li approached Celestine and asked why the rings were missing from the display case. Celestine denied any knowledge of the missing rings and Telesford stepped between Li and Celestine, and they both denied that Celestine had taken any rings. When Li tried to tell Telesford to ask Celestine to return the rings Telesford hit or patted Li on her left shoulder with his right hand. In response, Li hit Telesford back, who responded, "How dare you hit me," and hit Li a second time.

Li repeatedly told Telesford he was not a "good man" and he reacted by hitting her with both hands. Li then pushed Telesford away. At that time, Celestine offered to return two rings, which he either handed to Li or threw in the case. Li demanded the third ring but Celestine refused to return the stolen property. Telesford then gestured and told Celstine to "Go. Go. Go."

When Celestine moved to leave, Li said she was calling the police. Telesford replied that if Li called the police, he would also call the police and threatened Li based on what he presumed to be her immigration status. Both men then tried to leave the store. Telesford raised his arm as if he were going to hit Li which frightened Li who feared she would be struck again. One of the men also spat at Li. Li then felt that her right arm was being "tightly held" just as Telesford punched her in the right side of her mouth, causing her mouth to bleed.

Police Officers Gary Lamour and Trevor Watson were in the vicinity, and heard a woman yell for help. The officers saw Celestine holding a woman while Telesford punched her. The officers apprehended defendants, and Lamour then frisked both defendants and recovered a ring from Celestine's left front pants pocket which Li identified as her merchandise.

Li suffered a bruise to her arm where Celestine had grabbed her and from dizziness and headaches, and was treated for a mild abrasion to her lip. Her mouth hurt for several days and her her head hurt for "about one week."

Defendants denied they entered the store with the intent to steal anything. According to their testimony, seconds after they

entered the store Li approached the pair and accused them of stealing something. Then, another woman in the store hit Celestine in the shoulder. In response, Celestine asked the woman, "What are you doing, Miss?" and denied that he had taken anything. Li then tried to go into Telesford's pockets, and he brushed off her hand. Li then spat in Telesford's face, and as a "reflex" or a "reaction," his hand "just went up" and he "backhand[ed]" Li to stop her from spitting on him or doing "anything else."

During its final charge, the court instructed the jurors that it was their "obligation" to "evaluate" the evidence as it applied to "each defendant separately"; that the jurors must consider "each instruction on the law" as "referring to each defendant separately"; that they must return a separate verdict for each defendant; and that those verdicts "may be, but need not be, the same." The court reminded the jury that the People had the burden of proving beyond a reasonable doubt that "each defendant" acted with the same state of mind required for the commission of the crime, and, "either personally, or by acting in concert with the other person," committed each of the remaining elements of the crime.

After giving the standard CJI instruction on accessorial liability and robbery (forcible stealing), as to the count of second-degree robbery of which defendants were convicted, the court explained that a defendant is guilty under this count "when that person forcibly steals property and when in the course of the commission of the crime, that person or another participant in the crime, causes physical injury [impairment of physical condition or substantial pain] to any person who is not a participant in the crime." Thus, the court charged that with respect to each defendant separately, the People had to prove beyond a reasonable doubt both (1) that defendant personally or by acting in concert with another person forcibly stole property from Li; and (2) that in the course of the commission of the crime, defendant, or another participant in the crime, caused physical injury to Li.

Regarding the charge of second-degree robbery under count one, the court advised that a defendant is guilty under this count "when that person forcibly steals property and when that person is aided by another person actually present." The court charged that with respect to each defendant separately, the People had to prove beyond a reasonable doubt both (1) that defendant personally, or by acting in concert with another

person, forcibly stole property from Li; and (2) that the person was aided in doing so by another person actually present. Celestine was also charged with petit larceny, and the court instructed the jury on that count.

When the court concluded its charge, Celestine's counsel objected to the part regarding the theory of robbery aided by another, arguing "that by charging them acting in concert I don't think that's a correct statement of the law." She asserted that a correct statement of the law would be as to each individual that Celestine stole property, and in the course of doing so, was aided by Telesford, arguing that it requires forcible stealing by one defendant and aid in that stealing by the other, and that either defendant could have used the force in stealing where they both shared the intent to commit the underlying theft. Counsel also noted that it does not matter which one of them inflicts the injury. The court asked if counsel was asking it to reread the elements without the accomplice liability part, and counsel stated that particularly to the robbery (aided by another) charge, saying acting in concert makes it "messy," and it has "to be parsed out to the jury for them to understand that they must first find a forcible taking and then find the aiding by another." The court indicated that it would not change its charge. Celestine's lawyer took an exception and Telesford's lawyer joined.

The jury began its deliberations and shortly thereafter sent out a note asking for the court's clarification of "intent," as well as a written definition of the charges for both defendants. Celestine's lawyer argued that the note indicated that the jurors were "confused," and that "things need to be separated out, especially with respect to the robbery." Telesford's lawyer agreed. The court declined to charge the jury in a different manner, and merely advised the jury that it could not provide a written charge, but could read back any portion or the entire charge.

Soon thereafter, the jury asked to "hear the full definition of all the charges for both defendants," and Celestine's counsel said that she "repeat[ed her] objection." The court reread its charge regarding the separate consideration of each defendant. The court also repeated its accessorial liability charge, the definitions of larceny and forcible stealing, the elements of both counts of second-degree robbery, and its charge on the elements of petit larceny as to Celestine.

Later, the court followed Telesford's counsel's suggestion that it respond to a jury note by advising that there was no defini-

tion of "shared mind intent" and by rereading the definition of "working in concert." Without objection, the court also repeated its original charge on accessorial liability and offered to provide an expanded intent charge.

When the jurors sent out a note stating that they were "equally divided," the court asked them to continue deliberating the following day. The next day, the jurors requested to hear an "expanded definition of intent," and the court complied, without any objection from defendants. A few minutes later, the jurors asked to hear the "definition of intent again" and to "hear the charges again." Without any objection from either defendant, the court again repeated its original charges.

The jurors then returned a verdict convicting defendants of second-degree robbery under a physical injury theory. The jury did not reach a conclusion as to the other count of second-degree robbery, and did not consider the petit larceny charge.

On appeal, defendants both argue that the court erred in refusing defense requests to instruct the jury as to each defendant by inserting the names of each defendant into the jury instructions, and failed to meaningfully respond to jury inquiries to hear charges for both defendants, which confused the jury about how to correctly apply the intent element to defendants. Specifically, defendants argue that the court's charge would have permitted the jurors to convict them without finding that Telesford shared Celestine's intent to steal property, and that the record shows that the jurors were confused.

"In considering a challenge to a jury instruction, the 'crucial question is whether the charge, in its entirety, conveys an appropriate legal standard and does not engender any possible confusion'" (*People v Hill*, 52 AD3d 380, 382 [1st Dept 2008], quoting *People v Wise*, 204 AD2d 133, 135 [1st Dept 1994], *lv denied* 83 NY2d 973 [1994]; *see also People v Medina*, 18 NY3d 98, 104 [2011] ["In evaluating a challenged jury instruction, we view the charge as a whole in order to determine whether a claimed deficiency in the jury charge requires reversal"]).

Further, a trial court "must respond meaningfully" to inquiries from a deliberating jury (*People v Almodovar*, 62 NY2d 126, 131 [1984]). Significantly, however, the trial court possesses discretion in framing supplemental instructions as it must "give such requested information or instruction as [it] deems proper" (CPL 310.30; *see also People v Santi*, 3 NY3d at 248). The sufficiency of a court's response to a jury note is gauged by the form of the jury's question, the particular issue of which in-

quiry is made, and the response actually given (*see Almodovar*, 62 NY2d at 131-132). Speculation or assumptions about the jurors' thought processes are not sufficient to show "serious prejudice" to a defendant such that reversal of the conviction is warranted (*see People v Agosto*, 73 NY2d 963, 967 [1989]).

Initially, the majority does not and cannot take issue with the court's main charge. First, the court's instructions for both counts of robbery in the second degree tracked the model language in the CJI. Regarding the claims raised by defendants, the court specifically instructed the jury that it was their obligation to evaluate the evidence as it applied to "each defendant separately," and that they must consider "each instruction on the law" as "referring to each defendant separately." The court also instructed the jurors to return a separate verdict for each defendant and advised that those verdicts "may be, but need not be, the same."

In addition, the court properly advised the jurors regarding the intent required to convict either defendant of robbery. It defined robbery as "forcible stealing," and stated that a person steals property and commits larceny when, "with intent to deprive of another [sic] of property or to appropriate the property to himself," such person wrongfully takes, obtains, or withholds property from the owner of the property. The court added that a person forcibly steals property when, in the course of committing a larceny, he uses or threatens the use of physical force on another person "for the purpose of," inter alia, preventing or overcoming resistance to the taking of the property or for the purpose of preventing or overcoming resistance to the retention of the property immediately after the taking.

Moreover, the court delivered verbatim the standard CJI instruction on accessorial liability. The court instructed that, when one person "engages in conduct" that constitutes an offense, another person is criminally liable for such conduct when "acting with a state of mind required for the commission of that event," he "solicits, requests, commands, importunes or intentionally aids such person to engage in such conduct." And, the court instructed the jury that the People have the burden of proving beyond a reasonable doubt that "each defendant" acted with the "same state of mind required for the commission of the crime," and either personally or acting in concert with "the other person," committed each of the elements of the crime.

In sum, the court's charge was extensive, correct and did not stray from the model jury instructions. Thus, the only conclu-

sion to be drawn is that the jury was told the correct legal standards for evaluating each defendant's guilt.

Furthermore, there is no basis for the majority's position that the court's responses to the jury's inquiries were not meaningful. Indeed, as the majority concedes, "when the original instruction is accurate and '[w]here the jury expresses no confusion [regarding the original charge],' a simple reiteration of the original instruction suffices as a meaningful response" (*People v Santi*, 3 NY3d at 248, quoting *People v Malloy*, 55 NY2d 296, 302 [1982], *cert denied* 459 US 847 [1982]). And, as the majority notes, "a different charge may well be simply an exercise in semantics and could itself create the confusion sought to be avoided."

Here, there is no record evidence that the jury was confused by the court's instructions and the majority's finding to the contrary is conclusory and based in pure speculation. This case involved some complex legal theories and tricky concepts regarding what each defendant had to have intended that may be difficult for laypersons to apprehend after hearing the legal standards only once. It is therefore reasonable that the jury might request multiple repetitions of portions of the instructions during deliberations so that they may completely understand the court's instructions and render a correct and appropriate verdict. In such circumstances, the court's rereading of its original charge was a proper and meaningful response that was well within the court's discretion (*see People v Santi*, 3 NY3d at 248).

Contrary to the majority's description of this case, the record reveals that the jury's first two requests merely sought a repetition of the full charges for both defendants and the definition of intent. The court properly responded to these requests by rereading its charge. Likewise, when the jury asked for a definition of "shared state of mind" and a rereading of the definition of "working in concert," the court responded exactly as defense counsel suggested by advising the jury there was no definition of "shared mind intent" and by rereading the definition of "working in concert." Finally, the next day when the jurors twice asked for the definition of intent, and to hear the charges again, the court complied with these requests without any objections. Almost immediately after the court responded to the jury's final note by rereading its original charge, the jury returned its verdict.

While the majority projects a state of confusion onto the jury due to its different requests to hear certain definitions and a

repetition of the charges, this is mere speculation without any evidentiary or factual support. The fact that the jurors were deadlocked at one point during the deliberations and may have needed more time to comprehend the charges and legal principles before them does not mean they were confused. After a lengthy trial involving two defendants, requesting to hear the charges on different occasions over two days of deliberations is not unusual or proof of confusion.

The issue is not whether the supplemental instructions recommended by the majority might have been helpful to the jury. Rather, the discrete issue in this appeal is whether the trial court properly exercised its discretion in responding to the jury's inquiries and whether its responses were meaningful. Given that the original charge was clear and legally correct, and the jury never expressed any confusion, the court in repeating its original charge meaningfully responded to the jury notes.

Contrary to the majority's position, we cannot know the jurors' thought processes or conclude anything from the fact they made multiple inquiries to the court. As the Court of Appeals explained in *Malloy*,

> "When the jury requests further instructions on [a specific] legal point, such request does not necessarily import that the jury was perplexed or misled by the original charge. Rather, the jury simply may wish to have that critical concept refreshed in their minds or explained in isolation, without the distractions of the remaining portions of the full charge" (55 NY2d at 303).

Moreover, here the jury never gave any indication that the court's responses to its inquiries did not satisfy its concern. Finally, "[g]iven the subject of inquiry and the adequacy of the charge, it cannot be said that the court's exercise of discretion was improper" (*id.* at 303).

The majority misplaces reliance on distinguishable cases finding it to be error to reread the original charge in response to repeated jury questions. For instance, in *People v Pyne* (223 AD2d 910 [3d Dept 1996], *lv denied* 88 NY2d 940 [1996]) the record made clear that the jury was confused with regard to intent and immediately following the court's supplemental instructions, a juror exclaimed, "I still don't understand" (*id.* at 912), a circumstance not present in this case. Once again, contrary to the majority's assertion that the "jury repeatedly

expresse[d] confusion," none of the jurors in this case claimed, at any time, that they were confused or that they did not understand the court's charge. Further, in *People v Brabham* (77 AD2d 626 [2d Dept 1980]), the jury deliberated for four days and asked for further instructions on the issue of the defense of justification six times. Regardless, none of the cases cited by the majority stand for the proposition that the mere repeated requests mean per se that a jury is confused or necessarily require certain supplemental instructions. To do so would create an unenviable result. How many requests or inquiries would be deemed jury confusion? Nevertheless, the Court of Appeals' holding in *Malloy* explicitly holds to the contrary.

In contrast to the majority's cited cases, here the jury requested the reading of the definition of "intent" on three occasions and the court pursuant to a question by the jury advised it that there was no definition of "shared mind intent" and reread the definition of "working in concert." The court also reread the entire charge to the jury on two other occasions. There is no indication that there was confusion on the part of the jury. Rather, it appears that the lay jurors diligently performed their civic duties by making different inquiries to fully comprehend the lengthy and complex legal principles of the court's charge concerning a joint trial of two defendants in order to render a fair and just verdict. To hold otherwise would be an improvident exercise of discretion.

Nor is this case like those relied on by the majority where the evidence warranted a specific supplemental charge (*see e.g. People v Wheeler*, 220 AD2d 288 [1st Dept 1995]). As the majority notes, this was a "straightforward robbery case" and the verdict was legally sufficient and not against the weight of the evidence. While the jury required repetitions of the controlling legal standards, nothing about the evidence suggests the need for supplemental instructions such as those recommended by the majority, and the majority's conjecture about the jurors' purported confusion is not sufficient to show "serious prejudice" to defendants such that reversal of the conviction is warranted (*People v Agosto*, 73 NY2d at 967).

Nor can it be concluded that the jurors were confused because they failed to reach a decision on the second-degree robbery count under an aided theory. Defendants are merely speculating when they argue that the jurors could not agree that defendants were working in concert or that defendants had the requisite intent. Indeed, where, as here, the verdict is not

repugnant, it is "imprudent to speculate concerning the factual determinations that underlay the verdict because what might appear to be an irrational verdict may actually constitute a jury's permissible exercise of mercy or leniency" (*People v Horne*, 97 NY2d 404, 413 [2002]; *see also People v Brito*, 135 AD3d 627 [1st Dept 2016], *lv denied* 27 NY3d 1066 [2016]).

Although the majority would prefer if the court gave additional instructions on accessorial liability, intent, and acting in concert, all of the court's instructions on these issues accurately informed the jury about the legal principles it had to apply, and it cannot be said the charge or responses to the jury's inquiries were legally deficient or prejudicial. Further, as noted above, a different charge may have created the confusion about which the majority is concerned.

Defendants claim that by not inserting the name of each defendant in its charge and thereby "spelling out the charges" for each defendant individually, the court left the jurors free to convict on a finding that Celestine alone forcibly stole property, and Telesford alone caused physical injury to Li. Yet, the instructions informed the jury that with respect to Telesford, it could only convict if it found that "the defendant" then under consideration forcibly stole property either alone or acting in concert, acted with the intent to steal property, and that he or Celestine caused physical injury in the course of committing the robbery. With respect to Celestine, the instructions informed the jury that it could only convict if it found that he forcibly stole property either personally or acting in concert, and that he or Telesford caused physical injury during the commission of the crime.

It is also notable that the jurors never told the court that they needed clarification as to the interplay of the elements of the charges, and the majority can only speculate that the jurors could not agree that defendants were working in concert or that defendants had the requisite intent. If the jurors had had specific questions about the charge or wanted more detail or clarity than the original charge provided, they would have asked, just as they did when they asked for the court's "clarification of intent" and asked about "shared state of mind." Because they instead merely indicated that they wanted to hear the definitions the court had already provided, the court acted appropriately in restating the charge.

Accordingly, I would affirm the convictions.

MANZANET-DANIELS, GISCHE and WEBBER, JJ., concur with RENWICK, J.; TOM, J.P., dissents in a separate opinion.

Judgments, Supreme Court, New York County, rendered September 22, 2014, and September 16, 2014, reversed, on the law, the facts, and as a matter of discretion in the interest of justice, the judgments vacated, and the matters remanded for a new trial.